# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

ANDRE M. BRITTON,

                                    Plaintiff,

                                                        DECISION AND ORDER

                        -vs-
                                                        04-CV-6520-CJS
JO ANNE B. BARNHART, Commissioner
of Social Security,

                                    Defendant.

## APPEARANCES

For plaintiff:                      Neal P. McCurn, Jr., Esq.
                                    Oot & Associates
                                    503 E. Washington Street
                                    Syracuse, NY 13202

For defendant:                      Christopher V. Taffe, A.A.G.
                                    United States Attorney's Office
                                    100 State Street Room 620
                                    Rochester, NY 14614

## INTRODUCTION

**Siragusa, J.** This Social Security case is before the Court on the Commissioner's

motion (# 7) for judgment on the pleadings. For the reasons stated below, the Com-

missioner's decision denying benefits is reversed, and the matter is remanded.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for Disability Insurance benefits on October 10, 2000. (R. 14.) The application was denied initially, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[1] On October 22, 2003, a hearing was held before the ALJ, at which time plaintiff appeared with counsel and testified. (R. 438-91.) On March 4, 2004, the ALJ issued a decision finding that plaintiff was not disabled. (R. 14-23.)  The ALJ's decision became the final decision of the Commissioner when, on September 3, 2004, the Appeals Council denied plaintiff's request for review. (R. 3-5.) Plaintiff filed a complaint in this Court on October 22, 2004, and the Commissioner filed her motion for judgment on September 13, 2005. Both parties submitted on the motion papers.

## NON-MEDICAL BACKGROUND

Plaintiff was born on August 9, 1971, making him 36 years old at this time. He applied for Social Security disability benefits on October 10, 2000 (R. 108-17). He alleged a disability onset date of February 15, 2000, as the result of back and neck pain from a work-related injury that occurred on September 25, 1998. (R. 15, 191, 468.) He has a high school education. His work experience consists of the following: a dishwasher at Red Lobster from January 1993 until January 1994,  a janitor at Eastman Kodak Company from January 1994 until February 1996,  an assembler at Xerox Corporation from August 1996 until June 2000, then  a janitor at Rochester Institute of Technology in September 2000.

---

[1]The ALJ notes in his decision that this case had been remanded to him by the Appeals Council from a decision issued by another ALJ on July 24, 2002, in which that ALJ determined that plaintiff did not have a severe impairment. (R. 18.)

(R. 110.)[2] He stopped working on February 15, 2000 "because of pain in my neck and back." (R. 109.)[3] Plaintiff testified before the ALJ that he spends his day laying down at his house and watching television. (R. 468-69.) He further stated that he was able to take care of his personal needs and take his medication on his own (R. 470), and that he  visits family members and goes to doctors appointments. (R. 123.) Plaintiff also testified: that he was able to sit for thirty minutes at a time before he had to get up and move around for about ten minutes (R. 470-71); that he had to alternate between sitting and standing for forty-five minutes before he had to lie down for thirty minutes (R. 471);  that he was able to walk for one half of a block; and that he was not able to lift any weight (R. 471-72).

The ALJ also heard testimony from a vocational expert, Julie Andrews. Ms. Andrews testified in response to hypotheticals posed by the ALJ. She stated that if plaintiff was limited to the medium exertional level, and only able to occasionally stoop, crouch, kneel, or climb stairs, plaintiff could only perform one of his past relevant jobs, assembler. (R. 482.) In the second hypothetical, Ms. Andrews testified that if plaintiff could perform the entire range of sedentary exertional work, he would not be able to perform any of his past relevant work, but could perform as a preparer, DOT 700.687-062, order clerk, DOT 209.567-014, or surveillance system monitor, DOT 379.367-010. (R. 484-86.) In the third hypothetical, the ALJ asked Ms. Andrews to assume that plaintiff could sit for thirty minutes, stand for fifteen minutes, and only alternatively sit and stand for forty-five minutes

---

[2]At the hearing, the ALJ determined this to be an unsuccessful work attempt, since it lasted only one month. (R. 481.)

[3]Plaintiff also briefly held a job as a lot attendant at a car dealership, but the ALJ classified that as an unsuccessful work attempt and stated, "I'm not going to consider it." (R. 477.)

before being required to lie down. (R. 487.) This last hypothetical conformed to the testimony plaintiff gave at the hearing about his physical exertional abilities with regard to sitting and standing. (R. 471.) In response, Ms. Andrews testified there were no positions available. Finally, the ALJ asked Ms. Andrews to assume plaintiff could perform the full range of sedentary work, but had a mental impairment "which would impose no limits on activities of daily living, mild limits on social functioning, no limits on concentration, persistence, and pace, and never having had any episodes of decompensation or deterioration in the work or work-like setting," plaintiff could do all but the order clerk position. (R. 488.)

## MEDICAL HISTORY

On April 6, 1998, plaintiff was seen by Sylvia W. Park, M.D., complaining of thumb soreness from his work on machines at Xerox Corporation. (R. 190.) Dr. Park diagnosed overuse of the left thumb, and recommended that plaintiff approach Xerox about changing his job to minimize use of his left thumb.

Plaintiff returned to Dr. Park on September 28, 1998, after sustaining , while working at Xerox, the neck and back injury that he claims resulted in his disability. (R. 191.) Dr. Park determined that plaintiff was suffering from slight paraspinal muscle spasms at C4 and C5. (*Id*.) She prescribed pain medication (Darovecet and Flexeril), ordered him to refrain from lifting heavy objects, or going to work for the next four days, and directed that he be reevaluated by his primary care physician, Marshall E. Atwell, M.D.[4]

---

[4]Dr. Atwell and Dr. Park both worked at Alexander Medical Group, P.C., in Rochester,
(continued...)

Dr. Park saw plaintiff again on October 2, 1998, in connection with a "Workers' Compensation Visit Re-evaluation." (R. 192.) Dr. Park noted that plaintiff still had range of motion discomfort when hyperextending his arm behind his back, and that he had not been at work.  She switched him from Darvocet to Vicodin, continued the Flexural, and started him on Daypro. She also indicated he was to remain out of work until his reevaluation with Dr. Atwell. (R. 192.)

Plaintiff saw Dr. Atwell on October 9, 1998. Dr. Atwell noted that plaintiff had full range of motion in his neck, and no weakness in his arms. (R. 193.) He wrote that plaintiff's neck sprain had healed and cleared him for return to work on October 12, 1998 without restriction. (*Id.*)

Dr. Park next examined plaintiff on January 29, 1999, and she stated in her notes that plaintiff told her that his first experience with symptoms was on September 28, 1998, where he "was manipulating machines and lifting heavy objects and caused neck and left back discomfort." (R. 189.) Plaintiff reported to Dr. Park that he had been taking Vicodin and Darvocet for the pain, and that his symptoms had resolved by the time he saw Dr. Atwell in October 1998. (*Id.*) Dr. Park's examination in January 1999 revealed the following: that plaintiff had slight paraspinal muscle spasms, thoracic; that his range of neck motion was completely intact; that his reflexes and motor and sensory were intact; and that his back range of motion was completely intact with slight paraspinal muscle spasms present in the thoracic area. Dr. Park diagnosed plaintiff with "mild cervicalgia and paraspinal thoracic muscle spasms." (R 189).

---

[4](...continued)
New York. (*See* R. 190.)

On September 18, 1999, Dr. Atwell saw plaintiff for left shoulder girdle and arm discomfort. (R. 185.) Dr. Atwell's impression was that plaintiff was suffering from cervical spondylosis with peripheral neuropathy and pain. His notes under "plan" include the following: "[i]n order to substantiate his disability, I am referring him for further care to Dr. Robert Schrock or his associates."[5] (R. 185.)

From September 24, 1999 to January 5, 2000, plaintiff saw Peter Capicotto, M.D. of Greater Rochester Orthopedics, P.C. (R 196-201.) At the initial visit on September 24, 1999, Dr. Capicotto observed that plaintiff had neck and back pain, the cause of which he determined was musculogenic (R. 200-201.) In his report on plaintiff's January 12, 1999, examination, Dr. Capicotto wrote that plaintiff had a partial disability as the result of lower back pain. (R 197.) Dr. Capicotto's plan was to refer plaintiff to Richard Dobson, M.D., of Physical Medicine and Rehabilitation, for evaluation and management since Dr. Capicotto had "little else to offer him." (R. 197.) During a January 5, 2000 follow up visit, Dr. Capicotto diagnosed a "flare-up of cervicalgia, possibly secondary to [plaintiff's] C5-C6 degenerative disease." (R. 196.)

Starting on January 11, 2000, plaintiff began to see Dr. Dobson. On that day, Dr. Dobson examined plaintiff and wrote in his detailed report that plaintiff suffered, "disk damage most likely involving the C5 6, and the L4-L5 level." (R. 215.) He planned to review plaintiff's electrodiagnostic studies and emergency room records from a visit to a hospital in South Carolina. Dr. Dobson prescribed Lodine and he  placed plaintiff on work restrictions that included no lifting more than twenty pounds and avoiding pushing, pulling,

---

[5]Greater Rochester Orthopedics, P.C., includes Peter N. Capicotto, M.D., as well as Robert D. Schrock Jr., M.D. (R. 200.)

reaching overhead, repetitive movements and bending over. (R. 216.) Dr. Dobson wrote that plaintiff could continue with "his current job since it is tolerable." (*Id.*) He concluded his report as follows: "In my opinion he continues with a permanent partial disability of a moderate degree that is causally related to the injury that occurred on 9/25/98." (*Id.*)

On January 20, 2000, plaintiff again saw Dr. Dobson and indicated that he was feeling better. (R. 213.) As a result of his examination, Dr. Dobson lifted the restrictions imposed during plaintiff's January 11 visit, and restricted plaintiff to lifting no more than seventy-five pounds rarely, up to forty pounds on an occasional basis, and up to twenty pounds frequently, cautioning plaintiff to use good form and technique for any lifting. (*Id.*) Dr. Dobson wrote in his report that plaintiff "continues with a disability although at this point it appears to be a mild disability. I believe he is at risk for recurrent injury, unless he follows proper body mechanics." (R. 213.) Dr. Dobson cautioned that plaintiff should avoid prolonged bending, twisting, pushing, stooping, crouching, or reaching overhead.

Plaintiff next saw Dr. Dobson on February 4, 2000 complaining of continued and increased back pain. (R. 212.) Upon examination, Dr. Dobson found stiffness in plaintiff's back with limited unfolding of the lumber lordosis, paraspinal muscle spasm on lateral bending, triggering pain mostly on plaintiff's left side. Dr. Dobson also noted a decrease in plaintiff's reflexes at his left knee and both ankles. (R. 212.) Dr. Dobson concluded: "I believe he has suffered an aggravation of a pre-existing back injury. In my opinion he has a temporary severe partial disability because of the injury that occurred on 9/25/98 with a recent aggravation." (R. 212.) Dr. Dobson restricted plaintiff to light duty or sedentary work while he obtained physical therapy.

On February 25, 2000, plaintiff returned to Dr. Atwell, who, after examining him, determined that he had "low back strain secondary to the job he is doing now." (R. 184.) His plan was to continue plaintiff on Vioxx and to see Dr. Dobson the following Monday. Dr. Atwell also gave plaintiff a slip to be out of work until he saw Dr. Dobson. Dr. Atwell noted, "[t]his appears to be a garden variety low back pain, and it appears that he is overreacting to a large extent." (R. 184.)

On March 3, 2000, plaintiff saw Dr. Dobson again, complaining of continued back and neck spasms. (R. 211.) Dr. Dobson gave plaintiff a note allowing him to return to work doing light duty, but was unsure he could remain at Xerox, "because it appears as if they are unable or unwilling to accommodate his restrictions." (R. 211.) Dr. Dobson ordered a Magnetic Resonance Imaging Test ("MRI").

Dr. Dobson saw plaintiff on March 23, 2000. (R. 210.) He noted plaintiff was experiencing continued back spasms, and that he gave plaintiff a prescription for an MRI, which had recently been approved by plaintiff's insurance carrier.

On April 17, 2000, plaintiff returned to Dr. Dobson, following the MRI (R. 209.) Reading the MRI, Dr. Dobson wrote that

> MRI of lumbar spine is read as normal and at first glance it does appear to be normal. However, there is a speckling pattern of the water intensity signal in the disks especially at L3-L4 and L4-L5. This finding is a pattern that has been seen in disks that have significant disruption of the internal fibers.

(R. 209.) Dr. Dobson ordered dynamic spine testing "to see if we can determine any particular trunk angle or load weight at which his spine becomes abnormal functionally." (R. 209.) Dr. Dobson concluded that plaintiff had "a temporary total disability." (*Id*.)

On April 28, 2000, plaintiff saw Dr. Dobson, complaining of continued back pain. (R. 208.) Dr. Dobson noted in his report of that day's examination, that plaintiff needed to undergo a functional capacity evaluation to be performed over three successive days within on week, and that plaintiff, "continues with a temporary total disability…." (R. 208.)

During a May 18, 2000, visit, Dr. Dobson noted his request to plaintiff's insurance carrier for a discogram in the lumbar spine. (R. 207.) He reported that plaintiff continued experiencing back pain. Dr. Dobson also noted that he would schedule plaintiff for a trigger point injection in his lower back, and noted, "marked spasm within the paraspinal muscles and the quadratus lumborum muscles bilaterally." (R. 207.) Dr. Dobson concluded that plaintiff "continues with a temporary total disability…." (R. 207.)

On June 2, 2000, Dr. Dobson injected six cubic centimeters of 1 percent lidocaine into the paraspinal muscles at L5 through S1. (R. 206.) Dr. Dobson scheduled a follow up appointment for two weeks, and noted that plaintiff continued with a temporary total disability. (R. 206.)

During his June 15, 2000 follow up visit with Dr. Dobson, plaintiff reported that his pain diminished, but then returned more severely, and that he had difficulty sleeping at night as a result of pain. Dr. Dobson switched plaintiff from Vioxx to Celebrex and gave him a prescription for Vicodin to use at night. (R. 205.)

On July 7, 2000, plaintiff was again examined by Dr. Dobson, who noted that plaintiff was only able to bend at his waist to the point where his fingers remained forty-four centimeters above the floor. (R. 204.) Dr. Dobson noted that plaintiff was experiencing paraspinal muscle spasms, and that he was "unable to achieve long sitting position (with the knees fully extended) with his trunk at 90 degrees." (R. 204.) Dr. Dobson again

requested of plaintiff's insurance carrier that he receive a discogram.

On July 31, 2000, Dr. Dobson saw plaintiff, who continued to complain of back pain. Dr. Dobson requested that plaintiff be seen by Stephen B. James. D.O., and evaluated for possible intradiscal electrocoagulation therapy. (R. 203.)

On August 17, 2000, plaintiff underwent a consultative examination by Dr. James (R. 194-95.) Dr. James' diagnosis was "(724.4) Low back pain with left lower extremity radiculopathy." (R. 195.) Dr. James noted that plaintiff had undergone conservative treatments, but his condition remained the same, so he recommended a lumbar discogram.

During a September 19, 2000, visit, Dr. Dobson noted that plaintiff had obtained a job with Rochester Institute of Technology emptying reasonably lightweight trash cans. (R. 202.) Dr. Dobson concluded that plaintiff would not be able to continue in that position, and that he should undergo a functional capacity evaluation. (R. 202.)

On December 6, 2000, Janis L. Dale, M.D., reviewed a Physical Residual Functional Capacity Assessment previously completed by Verna Yu, M.D., a State agency physician, on November 14, 2000. (R. 223-30.) In the assessment, Dr. Yu concluded: that plaintiff could occasionally lift and/or carry up to fifty pounds; that he could frequently lift and carry up to twenty-five pounds; that he could stand, walk, or sit for about six hours in an eight-hour work day; and that he was unlimited with regard to pushing or pulling. Dr. Yu concluded that, "objective medical evidence supports the fact that [plaintiff] is capable of performing sedentary to medium work." (R. 229.)

On January 23, 2001, plaintiff underwent a lumbar discogram. (R. 319.) Mel S. Jacoby, M.D., made a radiographic report in which he concluded as follows:

> Minimal annular[6] degeneration is seen at L5-S1. The remainder of the study is within normal limits. The patient was clinically positive for pain response at L5-S1.

(R. 319.)

On February 6, 2001, plaintiff saw Dr. Dobson, who reviewed the discogram. (R. 233.) Dr. Dobson concluded that the discogram presented evidence of an annular tear at the L5-S1 level with some softening of that disc with the injection, but that the other discs were normal. (*Id.*) He recommended plaintiff for intradiscal electrothermal therapy.

On March 12, 2001, plaintiff returned to Dr. Dobson. (R. 232.) Dr. Dobson noted that plaintiff had been out of work for about one year, with the exception of a brief return to work for a month, and that he had applied for Social Security disability.

On March 13, 2001, plaintiff saw Jonathan W. Hager, M.D., his primary care physician (R. 235.) Dr. Hager indicated that plaintiff had "724.4 LUMBOSACRAL NEURITIS."[7] (*Id.*) He excused plaintiff from work "indefinitely until I det." (*Id.*)

On April 11, 2001, plaintiff again saw Dr. Dobson, who reviewed the films of the discogram. (R. 231.) He wrote that there was evidence of a disc degeneration and irregularity of the border of the nucleus with regard to the disc at L5-S1. Dr. Dobson noted

---

[6]The term is defined as "relating to, or forming a ring." Merriam Webster's Medical Desk Dictionary (1993) at 36.

[7]Lumbosacrial refers to the lumbar and sacral region or parts, and neuritis refers to an "inflammatory or degenerative lesion of a nerve marked especially by pain, sensory disturbances, and impaired or lost reflexes." Merriam Webster's Medical Desk Dictionary (1993), at 396, 471.

that, although plaintiff had seen Dr. James, Dr. James did not have the films available for review, and that he would arrange for them to be sent to Dr. James. He also noted that plaintiff could no longer afford his medications, requested the insurance carrier to arrange payment for them directly with the pharmacy, and wrote that "[i]n my opinion[,] until he receives the appropriate treatment[,] [plaintiff] remains totally disabled from all safely and reasonably jobs in the community." (R. 231.)

On May 4, 2001, plaintiff suffered from a psychological episode, and went to the St. Mary's Hospital emergency room at 11:10 a.m. with the chief complaint of depression. (R. 238-47, 320-39.) There he was first seen by a registered nurse[8] (R. 246) and then by Chiemeka Nwokonko, M.D. (238-39.) Dr. Nwokonko diagnosed plaintiff with DSM listings 311.0, Depression; 200.9, Suicidal Ideation; 724.5, Back Pain; and a maculopapular rash on his right upper eyelid, which may have been the result of an insect bite. (R. 239.) Dr. Nwokonko wrote that plaintiff's episode was precipitated by stress, unemployment, and marital problems resulting from his 1998 back injury. (R. 238.)

On the same day, May 4, 2001, plaintiff was seen by Lewis J. Perna, CSW, who wrote that plaintiff was not currently experiencing suicidal ideation, but that he admitted to having previously done so. (R. 253.) Mr. Perna recommended that plaintiff's level of pain should be attended to before assessing his mental health acuity. (R 253.)

In July 2001, plaintiff began seeing Rajeev Patel, M.D., an orthopedic specialist at Strong Memorial Hospital, who observed on August 20, 2001, October 1, 2001, and December 5, 2001 that plaintiff was partially temporarily disabled. (R. 289-95). At plaintiff's

---

[8]The nurse's name is illegible on the form. (R. 246.)

last appointment with him on December 5, 2001, Dr. Patel noted a total temporary disability resulting from plaintiff's previous work. (R. 290.) Dr. Patel also performed an Intradiscal Electrothermal Therapy ("IDET"), which requires surgical insertion and placement of a heating wire around the L5-S1 intervertebral disc. (R. 296.)

On January 21, 2002, plaintiff underwent a functional capacity evaluation at Rochester General Hospital conducted by Dawne M. Piccirilli, PT, CSCS.[9] (R. 263-70.) Ms. Piccirilli concluded from her thorough examination that plaintiff demonstrated the following characteristics:

- Antalgic gait pattern
- Malaligned sitting and standing posture.
- Impaired active range of motion at neck, bilateral shoulders, trunk, bilateral hips.
- Strength deficits bilateral upper and lower extremities, including abdominals.
- Bilateral grip strength weakness.
- Coordination/dexterity deficit.
- Low back pain and/or leg pain restricting active tasks.
- Impaired tolerance to static standing.

(R. 268.) Based on her examination, Ms. Piccirilli concluded that plaintiff could lift up to five pounds from the floor to his knuckle shoulder level, but only two pounds from his shoulder level overhead, and that he could carry up to ten pounds at his waist level. (R. 270.) She

---

[9]CSCS is the abbreviation used for Certified Strength Conditioning Specialist®:
Certified Strength and Conditioning Specialists (CSCSs) are professionals who apply scientific knowledge to train athletes for the primary goal of improving athletic performance. They conduct sport-specific testing sessions, design and implement safe and effective strength training and conditioning programs and provide guidance regarding nutrition and injury prevention. Recognizing that their area of expertise is separate and distinct, CSCSs consult with and refer athletes to other professionals when appropriate.
"About the CSCS Credential," NSCA Certification Commission, http://www.nsca-cc.org/cscs/about.html (accessed on July 26, 2006).

further concluded: that plaintiff could push or pull up to fifty-four pounds on a rolling cart for a maximum of thirty feet; that he could occasionally reach from thirteen inches to fifty-three inches from the floor to manipulate a one-pound object, but could rarely do this at a distance of sixty-one inches from the floor with both upper extremities;[10] that while standing, he could reach only rarely with a one-pound item or lighter from sixty-nine inches to thirteen inches from the floor[11]; that he could only rarely carry, with each upper extremity, up to four-and-four-tenths pounds and only for a distance of thirty feet; that he could remain standing for only three minutes continuously, then required a change in his position; and that he could only sit for thirty minutes continuously, then had to change his position. (R. 270.) She recommended that plaintiff continue to follow up with Dr. Dobson for lower back pain. (R. 269.)

On January 30, 2002, plaintiff once more saw Dr. Dobson for his lower back pain. (R. 373.) Dr. Dobson noted that he was "sitting in the chair with the left buttocks and leg protruding forward, in front of the right." (*Id*.) Dr. Dobson reviewed the functional capacity evaluation and concluded that plaintiff "has a very severe impairment in his back resulting in a total disability from work tasks." (R. 373.) He further wrote that even if plaintiff, with the assistance of "VESID",[12] found some type of computer-based activity for which plaintiff could be trained, "any activities would need to be done on a very part-time basis of no more than 30 to 60 minutes a day." (R. 373.)

---

[10]Further that she did not recommend continuous, repetitive motion of this type.

[11]Again recommending that he not engage in continuous, repetitive motion of this kind.

[12]New York State Vocational and Educational Services for Individuals with Disabilities. *See*  http://www.vesid.nysed.gov/ (accessed on July 26, 2006).

On March 1, 2002, plaintiff was again seen by Dr. Dobson. Plaintiff complained of continued back pain and of depression "because of his significant limitations in functional activities." (R. 374.) Dr. Dobson related that plaintiff reported: that he needed assistance with dressing "if he were going to dress in a normal time frame"; that he was experiencing constipation, and urinary urgency and frequency coinciding with his level of pain; that he had sexual dysfunction; was using a straight cane to improve his balance; and that he continued to have marked tenderness and stiffness in his lower back. (R. 374.) Dr. Dobson noted that plaintiff's discogram showed "discogenic pain the lower back." (*Id.*)

On February 3, 2003, plaintiff saw David Lainoff, M.D.,[13] at Rochester General Hospital. (R. 383.) Dr. Lainoff diagnosed musculoskeletal low back pain, gave plaintiff prescriptions for Naprosyn and Flexeril and a handout on back care.

On February 14, 2003, plaintiff underwent a consultative orthopedic examination by Ramon Medalle, M.D. (R. 388-91.) Dr. Medalle noted in his report that plaintiff had a history of discogenic disorder in the lumbar spine, mild musculigamentous disorder of the lumbar spine, and depression. (R. 391.) Dr. Medalle concluded:

> The claimant is mildly limited in activities requiring prolonged sitting, prolonged standing, bending, and lifting because of discogenic disorder of the lumbar spine. He has a concurrent psychiatric examination.

(R. 391.)

Concurrent with the February 14, 2003, orthopedic examination, plaintiff underwent a consultative psychiatric evaluation by John Thomassen, Ph.D. (R. 393-96). Dr. Thomassen determined that plaintiff "presents with rather mild symptoms of depression, secondary

---

[13]Dr. Lainoff's speciality, if any, is not revealed in the medical records his office provided to the ALJ. (R. 379-85.)

to his pain and the lack of income from not working. He is likely to benefit from counseling and/or medications to help him deal with these coping challenges." (R. 396.)

On February 18, 2003, Chung H. Bae, M.D., of Advanced Imaging of Kenmore and Advanced Imaging of Buffalo, read AP[14] and lateral views of plaintiff's lumbar spine. (R. 392.) Dr. Bae's impression was: "NO SIGNIFICANT ABNORMALITY IN THE LUMBAR SPINE." (R. 392.)

On May 20, 2003, plaintiff returned to Dr. Lainoff for a follow up on his complaint of low back pain. (R. 406.) Dr. Lainoff's assessment was that plaintiff suffered from chronic lower back pain, and continued him on Ultram and Elavil and referred him to the Medicaid liaison to obtain insurance, after which Dr. Lainoff intended to refer him to a pain center.

On September[15] 23, 2003, Dr. Lainoff completed a "Social Security Administration Office of Hearings and Appeals COMPLETE MEDICAL REPORT." (R. 398.) He also completed a "MEDICAL SOURCE STATEMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL)." (R. 399-400.) Dr. Lainoff indicated that he had been treating plaintiff from February 2003 to the present with "NSAIDS"[16] and was unable to send him to physical therapy due to lack of insurance. (R. 398.) With regard to his physical limitations, Dr. Lainoff indicated:  that plaintiff could lift or carry ten pounds occasionally; that he could stand or walk for less than two hours in an eight-hour workday; that had to

---

[14]A&P refers to anterior and posterior.  *See* Merriam Webster's Medical Desk Dictionary (1993) at 1.

[15]Dr. Lainoff's numerals are difficult to interpret. His date on the two reports described here could either be "9/23/03" or "5/23/03."

[16]NSAID is defined as "a nonsteriodal anti-inflammatory drug (as ibuprofen)." Merriam Webster's Medical Dictionary (1993) at 483.

periodically alternate sitting and standing to relieve pain and discomfort; and that his ability to push and pull were limited in the upper extremities.  (R. 399-400). In the category of Postural Limitations, Dr. Lainoff determined: that plaintiff could occasionally perform climbing of ramps, stairs, ladders, scaffolds; and that he could never balance, kneel, crouch, crawl, or stoop. (R. 400.) Dr. Lainoff wrote that plaintiff was unlimited in all listed activities in the manipulative limitations, visual/communicative limitations, and environmental limitations categories. (R. 401-02.)

On February 9, 2004, Rory P. Houghtalen, M.D., a psychiatrist at Unity Health, completed a Psychiatric Evaluation of plaintiff. (R. 431-37.) Dr. Houghtalen diagnosed plaintiff with DSM listings 296.2, Major Depressive Disorder, Single Episode, Moderate; 307.89, Pain Disorder Associated with Both Psychological Factors and a General Medical Condition; and 724.5, Pains Not Specifically Attributable to a Psychological Cause. (R. 431.) For the evaluation, plaintiff reported that he was unable to ride the bus or do housework, and that "he has been unable to function without significant pain and this has caused a major diminishing of life satisfaction and enjoyment." (R. 433.) Dr. Houghtalen's clinical analysis included the following language: "[t]his is a young adult African-American man with a complex mood and pain syndrome complicated by possible medication side affects [sic] and potential primary and secondary gains of his disability status." (R. 436.) Dr. Houghtalen increased the dosage of plaintiff's Effexor medication and scheduled a follow up appointment. (R. 437.)

**ALJ'S DECISION**

In his March 4, 2004, decision (R. 14-23), the ALJ determined that as of the onset date of February 15, 2000, plaintiff's chronic back discomfort and adjustment disorder with depressed mood were severe, but did not meet or exceed the listings in Appendix 1, Subpart P, Regulation No. 4. 20 C.F.R. Part 404 (2005). Additionally, the ALJ determined that plaintiff's subjective complaints of pain "were not persuasive."  He also found that plaintiff retained the residual functional capacity to  lift and carry ten pounds occasionally, and alternate sitting and standing during a normal eight-hour workday, and that plaintiff suffered only a mild limitation in social functioning. (R. 22.) Further, the ALJ ruled that although plaintiff could not return to any of his past relevant work, he could perform sedentary work, and that sufficient jobs, for which he was capable of employment, existed in the national and regional economy. (R. 23.) Relying on testimony from a vocational expert, the ALJ found that plaintiff could work as a preparer, DOT No. 700-687-062, or surveillance system monitor, DOT No. 379.367-010. (R. 23.)


**STANDARDS OF LAW**

*The Standard for Finding a Disability*

SSI benefits may not be paid to an individual unless that individual meets the income and resource limitations of 42 U.S.C. §§ 1382a and 1382b, and is disabled. 42 U.S.C. § 1382(a). For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501(citations and internal quotation marks omitted). Plaintiff bears the

burden of proof for steps one through four. The burden of proof shifts to the Commissioner

for the fifth step. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir.1998); *Colon*

*v. Apfel,* No. 98 Civ. 4732 (HB) 2000 WL 282898, *3 (S.D.N.Y., Mar. 15, 2000).

**The Standard of Review**

The issue to be determined by this Court is whether the Commissioner's

conclusions "are supported by substantial evidence in the record as a whole or are based

on an erroneous legal standard." *Schaal*, 134 F.3d at 501. It is well settled that

it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *see also Williams v. Callahan*, 30 F.

Supp. 2d 588, 592 (E.D.N.Y. 1998); *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023

(S.D.N.Y. 1992). Thus, the scope of review involves first the determination of whether the ALJ applied the correct legal standards, and second, whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Substantial evidence is more than a mere scintilla. It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). Although district court is not bound by the Commissioner's conclusions and inferences of law, the ALJ's findings and inferences of fact are entitled to judicial deference. *Grubb v. Chater*, 992 F. Supp. 634, 637 (E.D.N.Y. 1998).

Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Parker*, 626 F.2d at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id.*

### Treating Physician Rule

The law gives special weight to the opinion of the treating physician. The SSA's regulations provide:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The various factors applied when the treating physician's opinion is not given controlling weight include: (1) the frequency of

examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Id.* The regulations further provide that the SSA "will always give good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (2004); *see also*, *Schaal*, 134 F.3d at 503-504; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

## ANALYSIS

Plaintiff suggests seven reasons why the Commissioner's decision should be reversed.  First, he states that, "[h]ere, the [plaintiff's] treating sources have consistently opined that he is totally disabled." (Pl.'s Mem. of Law at 9 (citations to the record omitted).) Second, he claims that "[i]n assessing the [plaintiff's] residual functional capacity, the ALJ has relied upon the opinions of two non-examining medical consultants (R. 19) to the exclusion of the opinion of the primary treating medical source, Dr. Dobson, as well as the results of the functional capacity evaluation (R. 20)...." (*Id.*) Third, plaintiff argues that the "ALJ erred in relying upon the disability analysts' opinions in this instance as they are inconsistent with the substantial evidence of record and failed to 'cite specific clinical and laboratory findings, observations, lay evidence, *etc.*' which would serve to substantiate the opinions contained therein." (*Id.* at 10.) Fourth, plaintiff states that it appears the ALJ "substituted his own opinion as to the plaintiff's functional abilities for the opinion of the plaintiff's primary treating medical provider as well as the results of the functional capacity evaluation." (*Id.*)  Fifth, plaintiff claims that the ALJ failed to give sufficient weight to

plaintiff's subjective complaints of pain. (*Id.* at 11.) Sixth, plaintiff contends that the ALJ failed to develop testimony that sedentary work was available that could accommodate his need to alternate between sitting and standing and his need for bed rest. (*Id.* at 13.) Finally, plaintiff points out that the ALJ failed to address the side effects of plaintiff's medications, as required by SSR 96-7p. (*Id.*)

Contrary to the argument plaintiff makes in his memorandum of law, not all of his treating sources "have consistently opined that he is totally disabled." (Pl.'s Mem. of Law at 9.) Dr. Atwell,[17] who treated plaintiff in 1998, 1999 and 2000, assessed plaintiff's condition as "garden variety low back pain" and the stated his opinion that plaintiff was "overreacting to a large extent." (R. 184.) In addition, Dr. Lainoff, who began treating plaintiff in February 2003, wrote in a September 23, 2003 report to the Social Security Administration:  that plaintiff could lift or carry ten pounds occasionally; that he could stand or walk for less than two hours in an eight-hour workday; that he must periodically alternate sitting and standing to relieve pain or discomfort; and that plaintiff's ability to push and pull were limited in the upper extremities.  (R. 399-400). Although Dr. Lainoff indicated that plaintiff's ability to sit was affected by his impairment, he did not mark whether plaintiff could sit for less than six hours in an eight-hour workday, or could sit about six hours in an eight-hour workday. (R. 400.) He did, though, indicate that based on his history, plaintiff needed to periodically alternate sitting and standing to relieve pain or discomfort. (R. 400.) However, he made no mention of plaintiff's claim that he needed to lay down several times per day.

---

[17]In his examination report of December 20, 2000, Dr. Beemer referred to Dr. Atwell as plaintiff's "family doctor." (R. 422.)

Dr. Medalle performed a consultative orthopedic examination of plaintiff on February 14, 2003, and determined that plaintiff was "mildly limited in activities requiring prolonged sitting, prolonged standing, bending, and lifting" as a result of his "discogenic disorder of the lumbar spine." (R. 391.) Apparently from these sources, the ALJ concluded that "the substantial evidence of record documents that the claimant does not exhibit significant restrictions due to cervical spine or neck problems." (R. 16.)

Turning to plaintiff's argument that the ALJ failed to sufficiently explain the weight he gave to plaintiff's subjective complaints, Social Security Ruling 96-7p states in part:

> 5. It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p (*available at* http://ssa.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html) (Jul. 2, 1996). If a claimant alleges symptoms of greater severity than can be established by the objective medical findings, the ALJ must consider other evidence, including factors such as plaintiff's daily activities, the nature, extent and duration of his symptoms, and the treatment provided. 20 C.F.R. § 404.1529(a)(3). Plaintiff asserts that the ALJ failed to give specific reasons for his evaluation of plaintiff's subjective complaints of pain, referring to the ALJ's decision in which he wrote:

> Considering all of the foregoing factors, the evidence of record marked as Exhibits, the analysis herein and the testimony at the hearing, the Administrative Law Judge finds that the claimant's complaints of pain, discomfort and mental limitations were not persuasive and, therefore, treated accordingly

when assessing his ability to labor as set forth herein.

(R. 18.) The ALJ's reference to "all of the foregoing factors," is clearly a reference to the following: plaintiff's job history (R. 16, 17); his February 15, 2000 MRI and Dr. Dobson's assessment of it (R. 16);   Dr. Lainoff's February 2003 assessment (R. 16); the ALJ's recitation of portions of SSR 96-7p (R. 17); Rochester General Hospital intake notes of April 1, 2003 (R. 17, 405);  plaintiff's settlement of his Workers' Compensation case for a lump sum benefit, instead of continuing payments (R. 17); plaintiff's April 2, 2000 MRI (R. 17); Dr. Dobson's assessment in January 2000 that plaintiff could perform light work (R. 18, 213);plaintiff's lack of acute distress as noted in the mental health and examination and functional capacity notes (R. 18, 238, 252, 310); the fact that plaintiff performed his own personal hygiene needs and was adequately groomed; and the ALJ's opinion that plaintiff "minimized his activities of daily living and maximized his restrictions" and "tended to overstate his overall limitations when compared to physical findings…" (R. 18). The ALJ placed great emphasis on plaintiff's $78,100 settlement (after attorney fees) of his Workers' Compensation claim. (R. 19.) The ALJ noted that plaintiff:

> gave up all further future rights to Workers Compensation including weekly benefits, medical care and vocational training.… [T]his settlement is completely inconsistent with someone who is alleging total disability and is in the need of ongoing medical care, treatment and medication. The [plaintiff's] actions of settling this Workers Compensation case is also inconsistent with someone who is allegedly experiencing constant back pain assessed at an 8 level out of a scale of 1 to 10 with a 10 level rating of pain equivalent to the highest level of pain possible.

(R. 19, 462.) At the hearing, the ALJ pointed out to counsel and plaintiff that they had "a document indicating total disability, but a settlement for less than total in one forum [Workers' Compensation], and then coming to this forum with the same piece of evidence

that wasn't the determining factor in the other forum." (R. 454.)[18]

The ALJ's decision also addressed some of the numerous opinions by Dr. Dobson that plaintiff was disabled,[19] and the detailed medical findings Dr. Dobson made in support of his opinions. The ALJ referred to Dr. Dobson's restriction of plaintiff to sedentary work on February 4, 2000, which he changed to total disability on March 3, 2000, once Xerox was unable to find plaintiff a sedentary job. (R. 19.) The ALJ noted that once plaintiff settled his Worker's Compensation case, however, he no longer saw Dr. Dobson. (R. 19, 460.)

Dr. Dobson's other medical opinions were not as thoroughly analyzed in the ALJ's decision. For example, Dr. Dobson read plaintiff's MRI on April 17, 2000 and concluded that the discs at L3-L4 and L4-L5 showed evidence they had "significant disruption of internal fibers." (R. 209.) At this visit, Dr. Dobson wrote in his notes that plaintiff was temporarily totally disabled. (R. 208.) Dr. Dobson also wrote in his notes that plaintiff was temporarily totally disabled with regard to his May 18, 2000, examination of plaintiff. (R. 207.) On June 2, 2000, Dr. Dobson injected lidocaine into plaintiff's paraspinal muscles at L5 through S1, and wrote in his notes that plaintiff continued to be temporarily totally disabled. (R. 206.) After a thorough physical examination on July 7, 2000, Dr. Dobson

---

[18]However, as to worker's compensation, "[t]he issue of disability for purposes of workers' compensation is different from the issue of disability for purposes of Social Security disability benefits and SSI benefits. Workers' compensation determinators are directed to the worker's prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act." *Gray v. Chater*, 903 F. Supp. 293, 301 at n. 8.

[19]As the Commissioner points out in her memorandum of law (at 21), the issue of disability is reserved to the Commissioner, and a doctor's statement that a claimant is or is not disabled is not entitled to any special significance. 20 C.F.R. §404.1527(e)(1)-(3).

reported that plaintiff was unable to achieve a long sitting position and that he "has all the classic signs of a disk injury triggering muscle spasm and reduced flexibility." (R. 204.) Following a discogram, which was administered to plaintiff on February 6, 2001, Dr. Dobson saw plaintiff evaluated the results. Dr. Dobson determined that plaintiff had an annular tear at the L5-S1 level. (R. 233.) Dr. Dobson concluded that the discogram showed evidence of disc degeneration and irregularity of the border of the nucleus at L5-S1. (R. 231.) Dr. Dobson wrote in his notes, "[i]n my opinion[,] until he receives the appropriate treatment[,] [plaintiff] remains totally disabled from all safely and reasonably jobs in the community." (R. 231.) Additionally, Dr. Hager, who examined plaintiff, determined that plaintiff had lumbosacral neuritis and excused him from work. (R. 235.)

Dr. Patel also examined plaintiff in late 2001 and determined that he was partially temporarily disabled. (R. 289-95.) In a functional capacity examination conducted on January 21, 2002, by a physical therapist and Certified Strength Conditioning Specialist, plaintiff was shown to be able to lift only five pounds, and carry (at waist level) only ten pounds. (R. 270.) On January 30, 2002, Dr. Dobson reviewed that functional capacity evaluation and concluded that plaintiff "has a very severe impairment in his back resulting in a total disability from work tasks." (R. 373.) In his March 1, 2002 notes of plaintiff's visit, Dr. Dobson wrote that plaintiff was suffering additional symptoms from his back pain (constipation, urinary urgency and frequency) and that plaintiff was using a cane for balance. (R. 374.) The ALJ did obtain testimony from plaintiff about his medications and their effects. (R. 462-66, 469-70.) However, he did not address the issue in his decision.

The Court is aware that the treating physician rule in this Circuit greatly favors the opinions of plaintiff's treating physicians. The Court finds that Dr. Dobson's detailed reports

of his examinations and the results from the physical functional capacity testing, which Dr. Dobson also reviewed, should have been given controlling weight, or, failing that, that the ALJ should have explained why he was not giving Dr. Dobson's assessment controlling weight. The January 21, 2002 physical functional capacity testing showed that plaintiff could remain standing for only three minutes continuously, then required a change in his position; and that he could only sit for thirty minutes continuously, then had to change his position. (R. 270.) The test did not show, however, any need for laying down after forty-five minutes, as plaintiff claimed to the ALJ. (R. 470-71.) Nevertheless, the ALJ did ask a hypothetical question of the vocational expert based on plaintiff's claim that he needed to lie down after forty-five minutes of sitting and standing. In September 2003, Dr. Lainoff stated that plaintiff could stand or walk for less than two hours in an eight-hour workday and that he must periodically alternate sitting and standing to relieve pain or discomfort. (R. 399-400.) In light of plaintiff's testimony that must lay down several times a day, and the vocational expert's testimony that no jobs exist that are compatible with that requirement, the Court cannot find that the ALJ's conclusion, that plaintiff is capable of doing sedentary work, albeit with a sit/stand-at-will option, is substantially supported in the record. Further, the Court also does not find that the Record contains sufficient proof establishing plaintiff's disability and that a remand for calculation of benefits is warranted.

At remand, the ALJ should consider the effects of plaintiff's medications and obtain any further proof available on plaintiff's need to lay down several times per day. The residual functional capacities examination of January 21, 2002 did not address this issue, which the testimony of the vocational expert makes crucial. If, indeed, it is shown that plaintiff must lay down several times per day, then the Commissioner will be unable to

meet her burden of proof at step five of the sequential analysis. If, however, substantial evidence supports a determination that plaintiff does not need rest periods as he testified, then the vocational expert's testimony could support a finding for the Commissioner at step five.

## CONCLUSION

For the reasons stated above, the Commissioner's motion (# 7) for judgment on the pleadings is denied, the Commissioner's decision denying benefits is reversed, and the matter is remanded for a new hearing pursuant to the fourth sentence of 42 U.S.C. § 405(g).

SO ORDERED.

Dated:   August 11, 2006
         Rochester, New York

Enter:                        /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge